(No. 32274.—

THOMAS GIBBONS, Appellant, *vs.* THE RETIREMENT BOARD OF THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF CHICAGO, Appellee.

*Opinion filed June 4, 1952.*

Michael F. Ryan, of Chicago, (Richard F. McPartlin, Jr., of counsel,) for appellant.

John J. Mortimer, Corporation Counsel, and George F. Mulligan, both of Chicago, for appellee.

Mr. Justice Bristow delivered the opinion of the court:

The appellee, The Retirement Board of the Policemen's Annuity and Benefit Fund of Chicago, denied the application of Thomas Gibbons for disability benefit under the provisions of section 45 of the Policemen's Annuity and Benefit Fund Act. (Ill. Rev. Stat. 1949, chap. 24, par. 989.) Gibbons, herein referred to as plaintiff, then filed his petition for a writ of *certiorari* to have reviewed this adverse ruling of the board by the superior court of Cook County. This resulted in a judgment quashing the record of its proceedings. Upon appeal to the Appellate Court for the First District that determination was reversed. This court has allowed plaintiff's application for leave to appeal, and the cause is brought here for further consideration.

It is our duty to carefully consider the record to determine whether the findings of the administrative agency are against or supported by the manifest weight of the evidence and whether the agency acted arbitrarily and in abuse of discretion. (*Secaur* v. *Civil Service Com.* 408 Ill. 197, 203; *Drezner* v. *Civil Service Com.* 398 Ill. 219, 231.) With much detail we will therefore present the evidence that was adduced at the hearing.

The admitted facts appearing in this record are as follows: Thomas Gibbons was born on September 22,

1896, at Westport, Ireland, and was originally appointed patrolman in the police department of the city of Chicago on November 19, 1926. At all times prior to the accident, which we will describe presently, he was in good health and normal in all respects, both mentally and physically. At 11:55 P.M. on April 15, 1938, while he was on duty assigned to convey a prisoner to the lockup at Eleventh and State streets, and then to convey a patient to the County Hospital in a patrol wagon, the plaintiff was injured when the wagon was struck by a speeding truck travelling on an intersecting street. The patrol wagon was turned completely around several times and was turned over on its side, resulting in injuries to plaintiff who was riding in the rear of the patrol wagon taking care of the patient who was being conveyed to the County Hospital.

The primary inquiry posed by these proceedings is whether or not there was a causal relationship between the injuries sustained by Gibbons in the accident and his ill-health which subsequently followed. The plaintiff was first taken to the County Hospital by the Twenty-second district patrol where he received first aid treatment and was thereafter removed to the Alexian Brothers Hospital. On April 16, 1938, Dr. Steible, the police surgeon, made a physical examination of the plaintiff at Alexian Brothers Hospital and his official report showed that plaintiff sustained contusions of head and right side of chest. He remained in this hospital from April 16 to April 21, 1938, at which time he was discharged as "improved." The X rays revealed that there was no bone pathology. On May 17, 1938, Gibbons was examined by the police surgeon again, and his report showed that he was complaining of headaches and dizziness and severe pain in the left side of his chest. The surgeon's findings in this report were: "contusion of head; contusion of right side of chest; severe contusion of left side of chest with probably tearing of intercostal muscles."

The record of the police department shows that Gibbons was carried on the medical roll from April 16, 1938, to October 21, 1938, and that during all of this time he performed none of his functions as a patrolman but received full pay as provided by city ordinance for patrolmen hurt in line of duty. Subsequently, he was assigned to light duty consisting of guarding a safe containing moneys for the Community Fund. Finding himself unable to perform even such light work, he finally discontinued any sort of labor in March, 1939.

The evidence clearly shows that after the accident Gibbons suffered headaches and dizziness; that he found himself unable to sleep and was very restless; that he heard voices and would attempt to get away from the feeling of persecution; and that on one occasion he was removed from a train on a trip to South Bend complaining that the water was poisoned. On April 3, 1939, he was taken to Epworth Hospital, South Bend, and then on April 5, 1939, he was returned to Alexian Brothers Hospital where he remained until May 15, 1939. The hospital records on this occasion indicated a diagnosis of "traumatic neurosis see Dr. Gonda's report." The hospital report at the time of his discharge stated: "No change" and, also, the following: "This pt. was readmitted with the following: P. C. Hears voices, Restlessness, Insomnia. 1 yr. H.C. This pt. was originally admitted to the hospital on April 15, 1938 with injuries about the head and chest due to an accident. He was here 5 days, and now states that before discharge at that time he was apprehensive about all voices and sounds that he heard—believing they were talking about him. After discharge he continued under the care of the above M.D. until last Nov. and since then has been under the care of the 'city Dr.' He states now (3 days after admittance) that he knows the spells he has had are entirely in his mind and that he feels much better. He states that these spells have become more frequent and intense during

the past yr; he feels as though someone is chasing him all around. He does not hear voices when there actually is no sound, but feels that any voice he hears a radio broadcast refers to him in a persecuting sense. He states he has no spells when he is alone and it is quiet, nor does he think his occupation has anything to do with it. During the past 2 wks. he has suddenly gotten into his car and driven to neighboring states, trips in all directions trying to get away from the sense of persecution; only to find it intensified so he'd return promptly to Chicago. Thus he has recently been thru Ill., into Iowa, Mich., N. Y. etc. This persecution is perpetuated by a group of persons known to the pt. but their identity and reason was not learned." Recorded on this report was the intern's diagnosis as "acute hallucinosis." The record further indicates that Dr. Victor Gonda, an eminent neurologist, was called in consultation on April 8, 1939, and made an encelphalographic study of plaintiff's brain between April 20, 1939, and April 25, 1939, at which time Dr. Gonda stated: "Encelphalographic studies give definite proof of organic involvement of the brain." The clinical record for the period from April 5 to May 15, 1939, contains many references to mental confusion, suspicion, apprehension and delusions of persecution, suffered by plaintiff.

Then it was on April 27, 1939, that Dr. Steible, the police surgeon, re-examined the plaintiff at Alexian Brothers Hospital and his report was the following: "Post-concussional Psychosis. Atrophy of brain tissues with adhesions. This diagnosis was made from X rays and laboratory examinations by Dr. Victor Gonda, 25 E. Washington St. Neurologist in consultation with his attending physician." Again on May 27, 1939, the police surgeon examined the plaintiff at Alexian Brothers Hospital, taking a statement from him that he did not get along very well when he returned home from the hospital and his report was as follows: "Post-concussional Psychosis. Atrophy of

brain tissues with adhesions." Then on June 27, 1939, the police surgeon examined the plaintiff at his home, and at that time he was complaining of having headaches and that he was very nervous and tired easily. The surgeon's findings on that date were as follows: "Post-concussional Psychosis. Atrophy of brain tissue with adhesions. This man has improved some but in no mental condition to do police work." The report further indicated that the duration of his disability would be "Indefinite" and recommended disability pension.

The record further discloses that on July 7, 1939, Gibbons filed his application for duty disability. In this connection Gibbons testified that he was sitting outside the door of his home when the sergeant got out of a car and told him to come and sign up for a disability pension, whereupon he was taken to Dr. Kelley. He said he didn't remember signing the application, but he acknowledged that the signature on the application was his. The Retirement Board at that time failed to determine the claim of the petitioner for duty disability, but, instead, granted plaintiff ordinary disability benefits which resulted in his being paid $94.52 a month from April 1, 1939, until May 3, 1942. On October 11, 1939, the Retirement Board of its own motion indefinitely postponed the plaintiff's claim for duty disability. Appellant argues in this court that the Retirement Board was remiss in its duty in awarding plaintiff only ordinary disability and refusing to dispose of his claim for duty disability. It is claimed that the board acted arbitrarily and illegally in this regard, especially in view of the fact that the plaintiff was mentally unfit to protect his rights and to properly establish the validity of his claim.

The plaintiff's doctor advised him to take a long rest, and this he did by going to his native land, Ireland, in August, 1939, where he remained until 1946. He explains his long stay there by the intervention of war and his in-

ability to obtain safe and comfortable passage back to the United States. While he was in Ireland, the plaintiff did not perform any labor and in compliance with directions from the Retirement Board, forwarded to them medical reports concerning his condition. On the date of September 6, 1940, Dr. Michael J. McGreal of Rosmindle, Westport, County of Mayo, Ireland, made the following report: "This is to certify that I have on this day examined Thomas Gibbons. He complains of headaches and pain in the lower intercostal spaces on the left side in front. In my opinion the pain in the intercostals is a Fibrositis or Pleurodynia. He is also suffering from hypertension and shock in his nervous system." Another report from the same doctor on January 3, 1942, revealed the following: "This is to certify that Thomas Gibbons is at present under my care. He is suffering from Pleurodynia, headaches and dizziness and in my opinion is unfit for work."

The executive secretary of the Retirement Board on April 2, 1946, wrote to Dr. J. E. Kelley, physician for the board, stating that patrolman Gibbons wished to be returned to active duty and asked for a report on his condition. The following day Dr. Kelley made this report: "He is quite deaf, sluggish mentally, and very slow and uncertain in his speech. His memory is very faulty. His superficial reflexes are sluggish and he definitely lacks muscle-coordination. His pupils are contracted. He is the victim of neurosis. Patrolman Gibbons is unfit for police duty." About a year later on March 10, 1947, the same doctor made this report: "His reflexes are sluggish with moderate muscle incoordination but no paralysis. His heart is negative. He appears to be definitely a case of neurosis. Patrolman Gibbons is unfit for police duty."

It was not until the year 1949 that Gibbons sought legal counsel, and it was then that he applied for a hearing on his application and claim for duty disability. Many hearings were held at which time the records of the hos-

pital, police surgeon's report, and the reports of Dr. J. E. Kelley, physician for the Retirement Board, were introduced in evidence. The plaintiff and Mrs. McGuire, his sister, William Gillespie, the driver of the patrol wagon at the time of the accident, and Dr. Victor E. Gonda testified at the hearing. Dr. Gonda in his testimony indicated that he had re-examined the plaintiff, and he reaffirmed the diagnosis that he had made in the year 1939 that Gibbons was suffering from an organic brain involvement. He further gave as his opinion that there was a causal connection between the accident and the many disabilities that he had theretofore outlined in Gibbons's case and that his disability was permanent in character. He explained his conclusions by stating that the mental disturbance suffered by Gibbons was caused either by trauma or by a germ or from heredity. Any causation by germ was ruled out by him as a result of many tests, since the blood test revealed no sign of syphilis which frequently is the cause of brain disorder, and the urinalysis and X rays likewise were negative. The heredity theory of causation was also rejected because this disability came too late in life, for inherited weaknesses usually appear at a much earlier age.

The uncontradicted evidence by all physicians testifying in the case was to the effect that there could be a severe injury to the brain without any sign of injury to the head, scalp or face. The patrol wagon in which the plaintiff was riding revolved many times and then turned over. The plaintiff testified that in this process of revolving and turning over his head was struck several times, and that he was then thrown into the street where he was knocked unconscious; that he couldn't walk but crawled on his hands and knees to the sidewalk, and there he felt that "he fainted off." For one year following the accident, plaintiff was on the medical roll of the police department, being paid his full salary under the provisions of chapters 11

to 45 of the municipal code of Chicago. The commissioner of police and the police surgeon were convinced that the plaintiff was unable to work during the following year as a result of the accident, otherwise they would not have recommended the payment of his full salary while he was not employed. There was other evidence adduced at the hearing on behalf of the plaintiff to the effect that prior to the accident in question he was well, both physically and mentally, and that thereafter he suffered headaches and dizziness and that his behavior and acts were indicative of one that was mentally disturbed.

The board concluded its hearing of evidence on behalf of plaintiff on June 5, 1949, but at a subsequent meeting on August 18, 1949, directed him to report for examination to Dr. Harold C. Voris who is a neurological surgeon. Gibbons was examined by him on September 1, 1949, and Voris made the following written report to the board: "From the record at the Alexian Brothers' Hospital and from the present findings this patient has suffered from pronounced mental disturbance and at the present time, while orientated and cooperative, has obvious impairment of memory, judgment and insight. From the history, both given by the patient and from the records of the Alexian Brothers' Hospital, I am unable to relate this man's symptoms to the injury which he is alleged to have suffered April 15, 1938. There appears to have been a contusion of the chest wall and a mild cerebral concussion with only brief loss of consciousness. I believe that his present symptoms are very likely due to cerebral arteriosclerosis." Subsequently, Dr. Voris appeared before the board as a witness on behalf of the respondent. On direct examination he adopted the foregoing report as his medical conclusion in the case. On cross-examination there were developed many weaknesses in his testimony. The following observations indicate that his diagnosis is rather unconvincing. Dr. Voris did not venture an opinion based upon a reasonable degree

of medical certainty as to the cause of the symptoms present in the plaintiff since 1938 but simply stated, "I believe that his present symptoms are very likely due to cerebral arteriosclerosis." He admitted, too, that he was not trying to state the cause of the symptoms in 1939 because he did not examine him at that time. He did not make a comprehensive study of the instant case because he omitted the use of the X ray and encelphalogram. He did not have the benefit of the X-ray films taken by Dr. Gonda in 1939 during the course of his encelphalographic study at the Alexian Brothers' Hospital since those films were destroyed after the passage of five years in conformity with the custom of the hospital. He stated that arteriosclerosis usually appears in the sixth decade of life, and was unable to explain its presence in Gibbons at the age of 42. He admitted that one of the methods of determining possible traces of arteriosclerosis was to examine the optic fundi. This he did do, in 1949, but found no traces of arteriosclerosis. Certainly if they were absent then in 1949, they were absent 11½ years earlier, for admittedly, arteriorsclerosis is a progressive disease. Gibbons in recent years has exhibited some improvement. Since 1946, he has been able to perform a watchman or guard duty. Dr. Voris was unable to account for this inconsistency.

The Retirement Board found that the disability of the plaintiff, Thomas Gibbons, as claimed in his application for duty disability in July, 1939, was not due to the injury incurred by him in the accident of April 15, 1938, but was attributable to the hardening of an artery in his brain, which hardening was not connected with said injury. This conclusion was based solely and exclusively upon the report and statements of Dr. Voris in his testimony, since in no other part of the record, with all the various medical examinations therein contained—those of three other doctors—is there the slightest suggestion at any time that the plaintiff's disability was caused by cerebral arteriosclerosis.

After a careful analysis of all the evidence appearing in this record, we are of the opinion that the conclusion reached by the Retirement Board that there was no causal connection between the injury to the plaintiff in 1938 and his subsequent disability was against the manifest weight of the evidence and involved an abuse of discretion. Accordingly, the findings of the Retirement Board and the Appellate Court are reversed and the determination of the superior court is affirmed.

*Appellate Court reversed; superior court affirmed.*